# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4173 | **DATE** | 9/6/2002 |
| **CASE TITLE** | ERIC R. BROWN vs. CITY OF CHICAGO, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Court grants defendants City of Chicago and James Cacciottolo's motion for summary judgment [39-1], grants in part and denies in part defendants' motion to strike [50-1], and denies plaintiff Eric R. Brown's motion to strike as moot [43-1]. This case is hereby terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 0 9 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 51 |
| ✓ | Mail AO 450 form. | CLERK, U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 SEP -6 AM 9: 55 | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



DOCKETED

SEP 0 9 2002

| | | |
|---|---|---|
| ERIC R. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 00 C 4173 |
| | ) | |
| CITY OF CHICAGO and | ) | Judge Ronald A. Guzmán |
| JAMES CACCIOTTOLO, | ) | |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued the City of Chicago ("City") and James Cacciottolo

("Cacciottolo") for alleged violations of 42 U.S.C. §§ 1981, 1983 ("section 1981" and

"section 1983"). Before the Court is the City and Cacciottolo's motion for summary

judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c). FED. R. CIV. P.

56(c). Also before the Court are the parties' motions to strike various paragraphs of the

opposing party's LR 56.1 submissions. For the reasons set forth herein, the Court grants

defendants' motion for summary judgment, grants in part and denies in part defendants'

motion to strike, and denies plaintiff's motion to strike as moot.

### Defendants' Motion to Strike

Defendants have moved to strike paragraphs 165-68, 170-79, 181-84, 188, 190,

and 191 of plaintiff's LR 56.1(b)(3)(B) Statement of Additional Facts. Plaintiff failed to

respond to the motion. Upon consideration of the issues raised in defendants' motion to

strike, the Court grants the motion as to (1) paragraphs 166, 172, and 173 because the



statements are inadmissible hearsay; (2) paragraphs 165, 174, 176-78, 182, 184, 188 because the statements lack foundation; (3) paragraphs 172-73, 186, and 190 because the statements are unsupported by the cited portion of the record; and (4) paragraphs 167 and 168 because they lack relevance. The motion is denied as to paragraphs 170, 171, 175, 181, 183, and 191.

## Plaintiff's Motion to Strike

Plaintiff has moved to strike certain paragraphs of defendants' LR 56.1(a)(3) Statement of Undisputed Facts which cite for support the affidavit of Ann Nakaguchi ("Nakaguchi"), a City of Chicago Department of Personnel employee. Plaintiff asserts that Nakaguchi's affidavit must be stricken because defendants failed to identify her by name in response to Plaintiff's Interrogatory No. 2, which asked defendants to "[i]dentify all persons with knowledge as [sic] the assertions of any fact set forth in the Complaint or in Defendant's Answers to the Complaint and its Affirmative Defenses." (Pl.'s Mot. Strike, Ex. A ¶ 2.) However, as defendants argue, the information upon which Nakaguchi comments in her affidavit is information that was provided to plaintiff on two occasions. Plaintiff received information identifying the names and races of all interviewees for each of the three positions in which plaintiff alleged discrimination on February 3, 2000, in the Chicago Police Department's response to plaintiff's Equal Employment Opportunity Commission Charge. Plaintiff was again provided with the information during the course of discovery in this lawsuit on May 2, 2001. Nakaguchi is not an individual with knowledge of plaintiff's assertions of facts in the Complaint; rather, she merely has knowledge of the record-keeping procedures of the City of

Chicago's Department of Personnel. As defendants further argue, the numbers and

percentages drawn in Nakaguchi's affidavit are simple math. Even if the Court were to

strike Nakaguchi's affidavit, it would not aid plaintiff's case or create a genuine issue as

to a material fact. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001). This

is so because the underlying information is available elsewhere in the record. Therefore,

because (1) the information identifying the names and races of all interviewees for each

of the three positions in which the plaintiff has alleged discrimination in this lawsuit was

made available to plaintiff during the course of discovery, (2) the information is provided

elsewhere in the record; and (3) the percentages drawn by Nakaguchi in her affidavit are,

indeed, mere simple percentages, the Court denies plaintiff's motion to strike as moot.


## Undisputed Facts

### A. Eric Brown

Eric Brown, an African-American male, was hired by the City of Chicago,

Department of Public Works in 1981 or 1982 as a custodial worker. (Defs.' LR 56.1

(a)(3) Statement Material Facts (hereinafter, "Defs.' LR 56.1 Stmt.") ¶¶ 1, 3.) In 1994,

plaintiff was appointed to the position of Operating Engineer, Group C in the Department

of General Services. (*Id.* ¶ 5.) Five days after his appointment to Operating Engineer,

Group C, plaintiff was selected to be an acting Operating Engineer, Group A. (*Id.* ¶ 6.)

Both as Operating Engineer, Group C, and acting Operating Engineer, Group A, plaintiff

was assigned to work at Chicago Police Department ("the CPD") headquarters, then

located at 1121 South State. (*Id.* ¶ 8.) Plaintiff has worked as an acting Operating

Engineer, Group A, for the Department of General Services, from 1994 to the present,

and has received Operating Engineer, Group A pay. (*Id.* ¶ 11.) Plaintiff has never worked at any CPD facilities other than 1121 South State. (*Id.* ¶ 12.)

## B. James Cacciottolo

James Cacciottolo served as an Assistant Chief Operating Engineer who supervised plaintiff when he began as an acting Operating Engineer, Group A, at 1121 South State. (*Id.* ¶ 9.) In 1995, Cacciottolo laterally transferred to the CPD as an Assistant Chief Operating Engineer. (*Id.*) In 1998, Cacciottolo was promoted to Chief Operating Engineer for the CPD, where he supervised between 160 and 166 employees, including African-Americans. (*Id.* ¶¶ 16-18.) Cacciottolo is presently employed by the Department of General Services as one of six Chief Operating Engineers for the City. (*Id.* ¶ 20.) He has had no other employment-related claims filed against him other than the claims lodged by plaintiff in this lawsuit (*id.* ¶ 21) though plaintiff also filed a grievance relating to Cacciottolo's participating in the hiring selection process. (Plaintiff's Local Rule 56.1 (b)(3) Response to Defendants' Statement of Undisputed Material Facts (hereinafter, "Pl.'s LR 56.1 Resp.") ¶ 21.)


## C. Brown and Cacciottolo's Working Relationship

Cacciottolo worked with plaintiff at 1121 South State from the time that plaintiff began his employment there as acting Operating Engineer, Group A, in 1993, until October 1994, when Cacciottolo was transferred to a northwest side zone. (Defs.' LR 56.1 Stmt. ¶ 22.) Cacciottolo had no problems with plaintiff's work performance during this time. (Pl.'s LR 56.1 Resp. ¶ 24.) Cacciottolo never reprimanded plaintiff during this time. (Defs.' LR 56.1 Stmt. ¶ 25.) Plaintiff never complained to anyone about the way

4

Cacciottolo performed as his supervisor, and did not file any grievances against him in his supervisory capacity over plaintiff during this time. (*Id.* ¶ 26.) In approximately 1995, plaintiff asked Cacciottolo to speak to their union, Local 399, on behalf of plaintiff's candidacy for the office of union steward. (*Id.* ¶ 28.) Cacciottolo agreed to speak to the union on plaintiff's behalf and phoned Local 399 and recommended plaintiff. (*Id.* ¶ 29.) At the time that plaintiff interviewed with Cacciottolo for the three positions that are the subject of this lawsuit, Cacciottolo was no longer plaintiff's supervisor; at that time, Cacciottolo was employed by the CPD, not the Department of General Services. (*Id.* ¶¶ 31-32.)

At some point during the mid-1990's, furnace problems occurred at 1121 South State which resulted in the building temperature dropping to 40 degrees in some areas. (*Id.* ¶ 33.) Plaintiff was employed at 1121 South State at the time the furnace problems occurred, but was off work the day when the furnace problems occurred and was not responsible for the furnace problems. (*Id.* ¶¶ 34-35.) Cacciottolo never specifically accused the plaintiff of having contributed to the furnace failure. (*Id.* ¶ 36.) Shortly after the furnace problem occurred, Cacciottolo was transferred out of 1211 South State. (*Id.* ¶ 37.) According to plaintiff, Cacciottolo told him he was the only one who covered his back; plaintiff interpreted Cacciottolo's comment to mean that plaintiff was helping Cacciottolo, because at the time plaintiff was making sure everything was functioning properly. (*Id.* ¶¶ 38-39.)

### D. Job Opportunity Bid Announcement No. 047-99-05

Job Opportunity Bid Announcement No. 047-99-05, dated March 23, 1999, listed

5

job vacancies for Assistant Chief Operating Engineer with the CPD. (*Id.* ¶ 40.) Plaintiff

applied for the jobs posted in Bid Announcement No. 047-99-05 on March 25, 1999.

(*Id.* ¶ 41.) Cacciottolo, along with two other white males, comprised the panel that

interviewed applicants for the Assistant Chief Operating Engineer position. (*Id.* ¶ 42.)

All three individuals on the interviewing panel were employed by the CPD. (*Id.* ¶ 43.)

Twenty three applicants applied and interviewed for Assistant Chief Operating Engineer.

(*Id.* ¶ 47.) Of the twenty three applicants, eighteen were white, three were African-

American, and two were from other racial groups. (Defs.' Resp. Pl's Mot. Strike Certain

Paragraphs. Defs.' Undisputed Facts, Ex. B, EEOC Position Stmt. at 2-3 ("Defs.' Ex.

B.")) Three of those twenty three applicants were hired, namely Arthur Dowling, white,

Roger McGinty, white, and Joseph Kates, African-American. (*Id.*) Plaintiff did not

personally know any of the three individuals who were selected to the Assistant Chief

Operating Engineer positions prior to their selection. (*Id.* ¶ 48.) Prior to interviewing for

the position of Assistant Chief Operating Engineer, plaintiff had never served as acting

Assistant Chief Operating Engineer, had never worked at any CPD area headquarters,

and had never worked at any CPD district stations. (*Id.* ¶ 49.) The interviewing panel

used a Structured Interview Guide to summarize the interviewee's responses to

questions, as well as to record the panel's comments about each candidate's background

and skills. (*Id.* ¶ 50.) Cacciottolo, as the highest ranking managerial employee on the

interviewing panel, completed the Structured Interview Guide and Hiring Criteria Rating

Form for applicants to the Assistant Chief Operating Engineer position during their

respective interviews. (*Id.* ¶ 51.) After the interviews were completed, the panel used a

Hiring Criteria Rating Form to assign numerical scores to each candidate in the

categories set out in the rating form; after discussing the candidate with the other panel members, Cacciottolo finalized the scores for the candidates. (*Id.* ¶ 52.)

The Hiring Criteria Rating Form had ratings between 1 and 5, with 5 being the highest rating. (*Id.* ¶ 53.) There were four categories on the Hiring Criteria Rating Form. (*Id.*) The values for all four categories were averaged to produce an overall rating for each candidate. (*Id.*) During the interviews for the Assistant Chief Operating Engineer interviews, Cacciottolo would basically write down what the candidate told him in response to questions from the Structured Interview Guide. (*Compare* Defs.' LR 56.1 Stmt. ¶ 54 *with* Pl.'s LR 56.1 Resp. ¶ 54.) Plaintiff was not present during the interviews of Dowling, McGinty, or Kates. (*Id.* ¶ 55.)

Dowling, McGinty, and Kites were employees of the CPD at the time they interviewed for Assistant Chief Operating Engineer. (*Id.* ¶ 56.) At the time of his interview, Dowling was serving as acting Assistant Chief Operating Engineer and Cacciottolo was pleased with his performance in that capacity; Dowling also had experience interacting with the CPD command staff. (*Id.* ¶ 57.) Dowling received an overall rating of 4.0. (*Id.* ¶ 59.) McGinty had served as an acting Assistant Chief Operating Engineer. (*Id.* ¶ 60.) McGinty received an overall rating of 4.0. (*Id.*) Kates had served as an acting Assistant Chief Operating Engineer on vacation relief in the CPD. (*Id.* ¶ 62.) Kates received an overall rating of 4.0. (*Id.*) Plaintiff had never served as an acting Assistant Chief Operating Engineer. (*Id.* ¶ 64.) Plaintiff received an overall rating of 3.0. (*Id.* ¶ 65.) Plaintiff, along with the twenty two other interviewees, was considered qualified for the position of Assistant Chief Operating Engineer based upon his final score. (*Id.* ¶ 66.) Dowling, McGinty, and Kates had the highest scores on the

Hiring Criteria Rating Form, and were recommended for the three Assistant Chief Operating Engineer positions by the interviewing panel. (*Id.* ¶ 67.) Cacciottolo considered Dowling and Kates more qualified than plaintiff because they had served as acting Assistant Chief Operating Engineers at CPD area headquarters, while plaintiff had no experience as an acting Assistant Chief Operating Engineer. (*Id.* ¶ 69.) Cacciottolo considered McGinty more qualified than plaintiff because he had experience with new state-of-the-art equipment through his work with the CPD, Local 399, and hotels as well as experience as an acting Assistant Chief Operating Engineer and experience interacting with CPD command staff. (Defs.' LR 56.1 Stmt. ¶ 69; Pl.'s LR 56.1 Resp. ¶ 69.)

### E. Job Opportunity Bid Announcement No. 047-99-32

Job Opportunity Bid Announcement No. 047-99-32, dated April 20, 1999, listed job vacancies for Operating Engineer, Group A, with the CPD. (Defs.' LR 56.1 Stmt. ¶ 71.) Plaintiff applied for the jobs posted in this Bid Announcement on April 28. (*Id.* ¶ 72.) Cacciottolo, along with Samuel Mosley, African-American, and Joseph Cantorini, white, comprised the panel that interviewed applicants for Operating Engineer, Group A, for this Bid. (*Id.* ¶ 73.) All three individuals on the interviewing panel were employed by the CPD. (*Id.* ¶ 74.) Seventeen individuals both applied and interviewed for the position of Operating Engineer, Group A, pursuant to Bid No. 047-99-32. (Defs.' Ex. B at 3.) Of the seventeen applicants, 13 were white, three were African-American, and one was Hispanic. (*Id.*) Of the seventeen applicants, six were selected: Richard Fornuto, Hispanic; William T. Fern, white; Kevin Lyman, white; Dennis Arrigo, white; Herbert Hood, African-American; Marc Salter, African-American. (*Id.*) Plaintiff does not

personally know any of these individuals. (Defs.' LR 56.1 Stmt. ¶ 80.) Plaintiff did not sit in on any of the interviews with any of these individuals. (*Id.* ¶ 81.) Arrigo, Fornuto, Hood, Lyman, and Salter were all employed by the CPD at the time of their interview; Fern was employed by the Department of Aviation at the time of his interview. (*Id.* ¶ 82.)

Cacciottolo, as the highest ranking employee on the interviewing panel, completed the Structured Interview Guide and Hiring Criteria Rating Form for applicants to the Operating Engineer, Group A position for this Bid No. during each interview, as he had for the interviews for the previous position. (*Id.* ¶¶ 84-85.) Cacciottolo did the final candidate grading and was the final decision maker on the interview panel. (Pl.'s LR 56.1 Resp. ¶ 85.) The Hiring Criteria Rating Form had ratings between one and five, with five being the highest. (Defs.' LR 56.1 Stmt. ¶ 86.) There were three categories on the Hiring Criteria Rating Form. (*Id.*) Each candidate received as a final rating the average of the ratings in the three categories. (*Id.*) During the Operating Engineer, Group A applicant interviews for Bid No. 047-99-32, Cacciottolo basically wrote down what the candidates told him. (Pl.'s LR 56.1 Resp. ¶ 87.)

Arrigo received an overall rating of 4.0. (Defs.' LR 56.1 Stmt. ¶ 89.) Fornuto received an overall rating of 4.0. (*Id.* ¶ 91.) Hood received an overall rating of 4.0. (*Id.* ¶ 93.) Lyman received an overall rating of 4.0. (*Id.* ¶ 95.) Fern received an overall rating of 4.0. (*Id.* ¶ 97.) Salter received an overall rating of 4.0. (*Id.* ¶ 99.) Plaintiff received an overall rating of 3.33. (*Id.* ¶ 101.) Plaintiff, along with the sixteen other interviewees, was considered qualified for the position of Operating Engineer, Group A for Bid No. 047-99-32 based upon his final score. (*Id.* ¶ 102.) Arrigo, Fornuto, Fern,

Hood, Lyman, and Salter had the highest scores on the Hiring Criteria Rating Form, and were recommended for the six available Operating Engineer, Group A positions for Bid No. 047-99-32 by the interviewing panel. (*Id.* ¶ 103.) Cacciottolo considered Arrigo, Fornuto, Fern, Hood, Lyman, and Salter more qualified than plaintiff, in part, because the individuals selected had greater experience communicating with CPD command staff at area headquarters or other CPD facilities regarding the operational needs of the CPD at their respective locations. (*Id.* ¶ 105.)

### F. Job Opportunity Bid Announcement No. 047-99-113

Job Opportunity Bid Announcement No. 047-99-113, dated September 15, 1999, listed job vacancies for Operating Engineer, Group A, with the CPD. (*Id.* ¶ 106.) Plaintiff applied for the jobs posted in Bid Announcement No. 047-99-113. (*Id.* ¶ 107.) Cacciottolo, along with two other white males, comprised the interviewing panel that interviewed applicants for this job posting. (*Id.* ¶ 108.) Thirteen individuals both applied for and interviewed for the position of Operating Engineer, Group A, pursuant to this bid. (*Id.* ¶ 111.) Of the thirteen applicants, ten were white and three were African-American. (Defs.' Ex. B at 3.) Of the thirteen applicants, four were selected: Mark Nelson, white; Paul Bruno, white; Keith Burke, white; and Charles Flood, white. (*Id.*; Cacciottolo Dep., at 72-73.) Plaintiff did not sit in on any of the interviews with these individuals. (Defs.' LR 56.1 Stmt. ¶ 114.) Nelson, Bruno, and Burke were employed by the CPD at the time of their interview; Flood was employed by the Water Department at the time of his interview. (*Id.* ¶ 115.) The interviewing panel again used a Structured Interview Guide to summarize the interviewee's responses to questions, as well as to record the panel's

comments about each candidate's background and skills. (*Id.* ¶ 116.) Cacciottolo, as the highest ranking managerial employee on the interviewing panel, completed the various forms. (*Id.* ¶ 117.)

As in the prior interviews, the panel assigned numerical scores to each candidate; Cacciottolo was the final decision maker in determining and recording the scores. (*Id.* ¶ 118.) The final rating for each applicant was determined by averaging his score from three categories. (*Id.* ¶ 119.) Bruno received an overall rating of 3.66. (*Id.* ¶ 122.) Nelson received an overall rating of 3.66. (*Id.* ¶ 124.) Burke received an overall rating of 3.66. (*Id.* ¶ 126.) Flood received an overall rating of 3.66. (*Id.* ¶ 128.) Plaintiff received an overall rating of 3.33. (*Id.* ¶ 130.) Plaintiff, along with the other twelve interviewees, was considered qualified for the position based upon his final score. (*Id.* ¶ 131.) Bruno, Burke, Flood, and Nelson had the highest scores on the Hiring Criteria Rating Form, and were recommended for the four Operating Engineer, Group A positions. (*Id.* ¶ 132.) Cacciottolo considered the individuals selected more qualified than plaintiff because Bruno, Burke, and Nelson had greater experience with day-to-day operations of outlying CPD area headquarter facilities. (*Id.* ¶ 134.) Flood had assisted Operating Engineers for eighteen years. (*Id.* ¶ 134.)

### G. Statistics

Of the twenty three applicants who applied and interviewed for Assistant Chief Operating Engineer positions, eighteen were white, three were African-American, and two were from other racial groups. (Defs.' Ex. B, at 2-3.) Three individuals, two of whom were white and one of whom was African-American, were ultimately selected for

11

the Assistant Chief Operating Engineer Positions. (*Id.*) Thus, the pool of applicants for this position consisted of 78% white, 13% African-American, and 9% from other racial groups. (*Id.*) Of the individuals who applied and interviewed for the Assistant Chief Operating Engineer positions, 33% of those selected were African-American. (*Id.*) Of the African-Americans who applied and interviewed for the Assistant Chief Operating Engineer positions, 33% were selected. (*Id.*) Of the white individuals who applied and interviewed for the Assistant Chief Operating Engineer positions, 11% were selected. (*Id.*)

Of the seventeen applicants who applied and interviewed for Operating Engineer, Group A, pursuant to Bid No. 047-99-032, thirteen were white, three were African-American, and one was Hispanic. (*Id.*) Six individuals, three of whom were white, two of whom were African-American, and one who was Hispanic, were ultimately selected for the Operating Engineer, Group A position under this Bid. (*Id.*) The pool of individuals interviewed for these positions consisted of 76% white, 18% African-American, and 6% Hispanic candidates. (*Id.*) Of the individuals interviewed, 33% of those hired were African-American. (*Id.*) Of the African-Americans who applied and interviewed for these positions, 67% were selected. (*Id.*) Of the white individuals interviewed for these positions, 23% were selected. (*Id.*)

Of the thirteen applicants who applied and interviewed for Operating Engineer, Group A, pursuant to Bid No. 047-99-113, ten were white and three were African-American. (*Id.*) Four individuals, all of whom were white, were ultimately selected for the Operating Engineer, Group A, position under this Bid No. (*Id.*) Of the white individuals who interviewed for Operating Engineer, Group A positions pursuant to this

Bid No., 40% were selected. (*Id.*) Of the African-American individuals who interviewed for Operating Engineer, Group A positions pursuant to this Bid No., 0% was selected. (*Id.*)

In sum, fifty-three candidates applied and interviewed for 13 job openings; this number consists of the sum of the persons who applied and interviewed for each position, though an individual may have applied and interviewed for more than one of the positions, as did plaintiff. (*Id.*) Of these fifty-three candidates for the three bid announcements, forty-two were white, nine were African-American, and two were from other racial groups. (*Id.*) By percentage, 79% of the applicant pool consisted of whites, 17% consisted of African-Americans, and 4% consisted of members of other racial groups. (*Id.*) Of the individuals who applied and interviewed for the thirteen job openings in the three announcements, 23% of those selected were African-American. (*Id.*) Of the nine African-American candidates for the three job announcements, three of them, or 33%, were selected. (*Id.*) Regarding the race of those interviewed and subsequently hired for the thirteen positions, a statistical study of the results has determined that the results are not consistent with a finding of discrimination. (Pl.'s LR 56.1 Resp. ¶ 154.)

### H. City Policies

The City of Chicago had a policy of equal employment opportunities in its City of Chicago Personnel Rules at the time of the alleged discrimination against plaintiff by defendants. (Defs.' LR 56.1 Stmt. ¶ 155.) Rule V (5) of the Personnel Rules states that the Commissioner of Personnel will be responsible for maintaining, developing, and

implementing a program of equal employment opportunity without respect to race. (*Id.* ¶ 156.) Section 2-74-080 of the Municipal Code of Chicago, entitled "Discrimination - Unlawful activities" states that "no person shall discriminate against any employee or applicant because of race . . . ." (*Id.* ¶ 157.) Section 2-16-030 of the Municipal Code of Chicago (the Chicago Human Rights Ordinance), entitled "Unlawful discriminatory activities designated," states that no person or employment agency shall, "directly or indirectly," discriminate against any individual in hiring, referring, or recommending for employment, because of the individual's race. (*Id.* ¶ 158.)

## Discussion

Summary judgment is appropriate "if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, a court must view all the evidence and any reasonable inferences which may be drawn therefrom in a light most favorable to the non-moving party. *Sarsha v. Sears Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

The City contends that the plaintiff cannot establish the municipal policy or custom of intentional race discrimination required for the City's liability under sections 1981 and 1983. Both defendants further argue that plaintiff has failed to make out a

14

*prima facie* case of race discrimination under those statutes because the plaintiff has not shown that similarly situated employees of other races were treated more favorably. Finally, the defendants argue that plaintiff has failed to show that their legitimate and non-discriminatory reasons for the promotion decisions at issue is mere pretext for race discrimination. The Court addresses each argument in turn.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). This right "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privilege, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983.

To establish a section 1981 or section 1983 claim against a municipal state actor, a plaintiff must prove that he experienced a deprivation of a constitutional or federal statutory right and the deprivation was caused by government officers acting in accord with municipal policy or custom. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) ("[T]he express 'action at law' provided by § 1983 . . . provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."); *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978) (section 1983). A plaintiff must identify a municipal "policy" or "custom"

that caused the injury. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). There are three ways in which a municipality's policy can violate an individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994) (citations and internal quotations omitted).

First, plaintiff has not attempted to argue that the first scenario is triggered by the facts of this case. Plaintiff does not allege that the City of Chicago has any express official discriminatory policies.

Second, with regard to the next possible scenario for establishing a custom or policy of race discrimination, plaintiff alleges that the "disproportionate amount" of African-American applicants for the three jobs in question that were subsequently hired is circumstantial evidence of a racially discriminatory custom of the City. (Pl.'s Mem. Opp. Defs.' Mot. Summ. J. (hereinafter "Pl.'s Mem.") at 6.) However, plaintiff does not support this conclusion with any reference to facts or testimony. On the contrary, the evidence supplied in Defendants' Exhibit B along with the statistical analysis of Professor Moussa's report, as admitted by plaintiff, is not "consistent with a finding of discrimination." (Pl.'s LR 56.1 Resp. ¶ 154.) The only other information that plaintiff supplies to support the allegation that the City was engaged in the practice of a discriminatory custom is to reference plaintiff's testimony that someone told him that Cacciottolo swore to get even with the "Negroes" who caused his transfer from his

16

position at 1211 South State. (Pl.'s Mem. at 6.) However, as defendants have argued, this alleged statement is inadmissible hearsay, which, as a matter of law, cannot defeat summary judgment. *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 570 n.4 (7th Cir. 1989). Further, as also noted by defendants, Cacciottolo did in fact recommend Herbert Hood for promotion. Hood, an African-American, was employed at 1211 South State along with plaintiff and Cacciottolo.

With regard to the third scenario for establishing a custom or policy, plaintiff has not sustained his burden of establishing that Cacciottolo was an official with final policymaking authority. "[W]hether a particular official has 'final policymaking authority' is a question of state law." *St. Louis v. Praprotnik*, 485 U.S. 112, 483 (1988) (emphasis omitted). Brown has failed to provide any state or local law establishing that a person in Cacciottolo's position is an official with final policymaking authority. Further, the "[a]uthority to determine City employment policy is vested only in the City Council and its Department of Personnel." *Limes-Miller v. Chicago*, 773 F. Supp. 1130, 1136 (N.D. Ill. 1991). In any event, plaintiff has failed to even argue that such authority has been delegated to Cacciottolo. Having failed to establish a custom or policy through any of the three scenarios of racial discrimination, plaintiff has failed to establish municipal liability under either section 1981 or section 1983.

Next, defendants argue that even if plaintiff could establish that the City had a custom or policy of discrimination, his section 1981 and 1983 claims would still fail on the merits with regards to the City and Cacciottolo because plaintiff has failed to establish that race was a factor in the decision not to recommend him for any of the three positions at issue here. The Court agrees.

17

To prevail on his section 1983 equal protection claim or section 1981 claim, Brown must ultimately prove that he was the victim of intentional race discrimination. *See, e.g., Trautvetter v. Quick*, 916 F.2d 1140, 1150 (7th Cir. 1990) (section 1983); *Randle v. LaSalle Communications, Inc.*, 876 F.2d 563, 567 (7th Cir. 1989) (section 1981). Claims of intentional discrimination under section 1983 or section 1981 are subject to the same methods and order of proof as disparate treatment claims under Title VII. *Randle*, 876 F.2d at 568 (section 1981); *Riordan v. Kempiners*, 831 F.2d 690, 696 (7th Cir. 1987) (section 1983).

Under Title VII, discrimination may be established in two ways – either through direct evidence or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of employment discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decisions. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden, then the plaintiff must show that the employer's stated reason for dismissal is nothing more than pretext. *Id.*

Plaintiff argues in his Memorandum in Opposition to Defendants' Motion for Summary Judgment that his race was a factor in the decision not to recommend him for promotion in any of the three positions at issue here. Plaintiff appears to concede that he is unable to establish racial animus through the first of the two possible methods set out in *McDonnell Douglas*, 411 U.S. at 802. Plaintiff has not produced any direct evidence

18

of race discrimination in the decisions not to recommend him for promotion.

Without direct evidence, a plaintiff may establish his claim of racial discrimination by indirect evidence. *McDonnell Douglas*, 411 U.S. 792, 802. The plaintiff has the burden of setting out a *prima facie* case by presenting evidence that he (1) belongs to a racial minority group; (2) he performed his job satisfactorily and was qualified; (3) he was not promoted (all three positions for which plaintiff applied would have constituted promotions); (4) similarly situated employees outside of his protected group were treated more favorably. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994).

Both parties concede that the first three elements of the *prima facie* argument have been satisfied by plaintiff. The dispute arises over the fourth element. As noted, the plaintiff has the burden of establishing a *prima facie* case, and must do so by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

Plaintiff first notes that "of the 11 vacancies only 2 positions went [sic] African Americans." (Pl.'s Mem. at 4-5.) Plaintiff next notes that all four of the vacancies for the third position for which he applied were filled by white applicants. (*Id*. at 5.) It is not clear whether plaintiff intends to claim that only eleven positions were vacant, or if eleven vacancies were available for the first two positions for which the applicant applied and an additional four were available for the final position. In any event, the correct total, as illustrated in Exhibit B, is thirteen, not eleven or fifteen. The actual number of African-American applicants hired for the thirteen vacancies is three, not two. Plaintiff's attempt to establish the fourth element necessary to establish a *prima facie* case of racial discrimination appears to rest on these figures, misstated though they are in his

Memorandum in Opposition to Defendants' Motion for Summary Judgment. Plaintiff also argues that "some of the white hires did not meet minimum qualification standard [sic]." (*Id.*)

Plaintiff has failed to establish the fourth element of the *prima facie* case. As defendants point out, African-Americans were selected for promotions for both the Assistant Chief Operating Engineer and Operating Engineer, Group A positions. (Defs.' LR 56.1 Stmt. ¶¶ 47, 78.) As shown by making simple calculations from the information in Exhibit B, a higher percentage of African-Americans were selected for the Assistant Chief Operating Engineer and Operating Engineer, Group A positions relative to the percentage of African-Americans in the interview pool compared to white candidates. It is undisputed that the evidence supplied in Defendants' Exhibit B along with the statistical analysis of Professor Moussa's report is not "consistent with a finding of discrimination." (Pl.'s LR 56.1 Resp. ¶ 154.)

Further, plaintiff argues fleetingly that some of the white applicants did not meet the minimum qualifications for the three positions. (*See* Pl.'s Mem., at 5.) Unfortunately for plaintiff, he does not provide sufficient evidentiary support for this argument. (*See* Pl.'s LR 56.1 Resp. ¶¶ 171, 185, 187, 189.) Moreover, the record is devoid of facts that show Cacciottolo treated African-American applicants differently than white applicants with regard to the selection process for any of the positions at issue.

Thus, plaintiff's argument rests solely upon the raw numbers of applicants and those ultimately hired. The numbers of African-Americans who applied and interviewed for the three positions and the numbers of African-Americans ultimately hired to fill those positions, relative to the numbers of white applicants who interviewed and were

ultimately hired to fill those positions, without more, is simply not sufficient to demonstrate that similarly situated employees outside of his protected group were treated more favorably. Because he failed to satisfy the fourth prong of the *prima facie* case, the Court grants defendants' summary judgment motion.

Furthermore, even assuming *arguendo* that plaintiff could established a *prima facie* case of race discrimination, the City has articulated legitimate, nondiscriminatory reasons for not recommending plaintiff for promotion. The City has stated that other applicants and interviewees for the positions were more qualified than plaintiff (while admitting that plaintiff was qualified). Plaintiff seems to miss the point that even though he was qualified for the job, there could have been applicants that were even more qualified for the job positions. Other applicants had higher scores on their hiring criteria rating form because they had, among other things, more experience with equipment and machinery, more experience interacting with command personnel, and/or more supervisory experience.

Because the City has articulated legitimate, nondiscriminatory reasons for its decisions, plaintiff is required to show that each proffered reason is pretextual. To do so, plaintiff would have to "*specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). Further, to demonstrate pretext, plaintiff would be required to "show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation." *Johnson*, 260 F.3d at 732 (internal quotations omitted); *see also Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) ("[W]hen reviewing a grant

21

of summary judgment, the only question before us is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies."); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The mere fact that the employer acted incorrectly or undesirably . . . cannot adequately demonstrate pretext; rather, the employee must prove that the employer did not honestly believe the reasons it gave . . . .").

To show that the proffered nondiscriminatory reasons are pretextual, plaintiff would have to show one of the following: (1) defendants' explanation of their decisions has no basis in fact, or (2) the explanation was not the "real" reasons, or (3) the reason stated was insufficient to warrant the allegedly discriminatory action. *Id.* Thus, plaintiff's burden would be to show that defendants lied when they stated that they believed that other candidates were more qualified than plaintiff with regard to familiarity with equipment and machinery, experience in interacting with related staff, supervisory experience, and familiarity with outlying branch facilities. *See Velasco v. Ill. Dep't of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001) (stating that plaintiff cannot withstand summary judgment if he fails to create triable issue of fact with respect to each of his employer's legitimate reasons). Plaintiff presents no arguments that defendants lied. Rather, plaintiff makes vague arguments that the answers he gave during his interviews were incorrectly or incompletely recorded or speculates that the answers he gave during interviews were attributed to white interviewees. Plaintiff admits, however, that he was not present at any of the interviews of the individuals ultimately selected for promotion. He offers no evidence that his answers during his interviews were inaccurately recorded to such a degree that such inaccuracies were the cause of his not

being recommended for promotion. Accordingly, based on the record before the Court, no rational jury could find in favor of Brown.

In sum, defendants are entitled to summary judgment on plaintiff's section 1981 and section 1983 discrimination claims. Plaintiff has failed to establish a *prima facie* case of discrimination, and even if he had, he has failed to show that defendants' proffered reasons are a pretext for discrimination.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [doc. no. 39-1], grants in part and denies in part defendants' motion to strike [doc. no. 50-1], and denies plaintiff's motion to strike as moot [doc. no. 43-1]. This case is hereby terminated.

**IT IS SO ORDERED**                               ENTERED: 9/6/02

HON. RONALD A. GUZMAN
**United States Judge**

23